## Case No. 9,754.

### MOORE v. The CHARLES MORGAN.

[3 Cin. Law Bul. 42.]

District Court, S. D. Ohio. 1878.

SALE—WARRANTY—MACHINE MADE FOR PARTICULAR PURPOSE—WELL KNOWN AND ASCERTAINED MACHINE.

Where a machine ordered and sold is a known and ascertained article, the purchaser is liable whether it answers the purpose for which it was intended or not. But where it is not a known and ascertained article, but it is a specific chattel ordered and made to perform a certain purpose, the law implies a warranty that it shall be fit for the purpose for which it was intended. The mechanic making the machine may, however, relieve himself from such warranty by a specific contract not to be responsible for the adaptability of the machine for the intended purpose.

In admiralty.

Henry Hooper and F. W. Moore, for libellant.

Coppock & Caldwell, for defendant.

SWING, District Judge. The libellant, [Arthur G.] Moore, sues the steamboat, Charles Morgan, for machinery, viz.: a steam condenser, supplied at the request of the master, and upon the credit of the boat, and claims the sum of $2,333. Captain Stein, the master and owner, sets up as a defense, that Moore induced him to purchase a certain apparatus, called a "steam condenser;" that he held himself out as a skillful mechanic and that the condenser would answer the purpose for which it was made; that the machine was a new mechanical contrivance, called "the condenser," to be connected with the engines and boilers, and would cause a great saving of fuel, and enable the boat to run with lower pressure of steam; that relying upon these representations, he entered into an agreement with the libellant for the construction of said "condenser," for which he was to pay what the labor and materials would fairly be worth; that Moore constructed the machine, and represented that the same was built in a workmanlike manner, and would accomplish the purpose for which it was made; that on trial it was found to be constructed in such an unworkmanlike manner, that it would not, and did not, answer the purpose for which it was constructed, and was utterly worthless; that it was constantly giving way, breaking, causing detentions, and endangering the other machinery of the boat; and that he was finally compelled to remove it, on account of the inferior materials, defects, and want of skill in its construction. The condenser was an utter failure and of no value. The libellant had concealed the fact that he was not using proper skill and materials, and thereby perpetrated a fraud upon him, and induced him (the claimant) to pay a thousand dollars, for which he asks judgment. This is the state of the pleadings between the two parties. The proof shows that the condenser and apparatus was furnished the boat, and that the materials and labor in it were reasonably worth $3,333.60; that libellant had been paid upon the same the sum of $1,000, and that the balance is still due thereon. Of course, if the proof sustains the allegations of the claimant, he is still entitled to a decree. The general facts are these: Jones, Leathers & Pauley, patentees of a condensing engine, which they represent as a machine of great merit, were very anxious to introduce it upon the boats of the Western waters. For this purpose they prevailed upon Capt. Stein, an old steamboatman, whose reputation as a navigator was very high, to adopt the machine and place it upon his new

boat. Moore, the libellant, was a machinist, manufacturing machinery for steamboats, having no connection with the patentees, or interest in the patent.

This is the position of the three parties when they undertook to make the arrangement, out of which this difficulty originated. The original and incipient steps were as follows: Witness Thorp says, that Leathers, one of the patentees, solicited him to use his influence with Capt. Stein to have him put a condenser on his boat, and that if it failed, it should cost him nothing. Leathers himself says, that he induced Stein to put it on, and that he made the arrangements for that purpose with Stein. The letters in the case also show an effort upon the part of the patentees to induce Capt. Stein to enter into this contract. The letter of Pauley, which Leathers says was written under his direction, states: "Captain Stein and myself had a talk Saturday, and we have come to the conclusion that it would be best for you to go down with Stein, if you possibly can make the trip, that is to Vicksburg. He wants the condensers, and he wants you (Moore) to build them. Capt. Leathers and myself will guarantee them." Now as to the agreement, Moore says that he told Capt. Stein, in the presence of McFarland, the engineer, that he took no responsibility whatever in regard to the working of the machine, and he gives the following as the understanding between the parties: First—He was to build the machine. Second—That Capt. Stein was to pay him for it. Third—That Capt Leathers was to assist Stein in payment, either by negotiating his paper, or giving time. McFarland corroborates Moore in assuming no responsibility whatever in regard to the working of the machine, the conversation having taken place in his presence. Nor does Capt. Stein contradict this in terms. He insists from time to time that Leathers should be responsible to Moore for the balance of this money. He goes so far as to cause Moore to draw a check upon Leathers. And when suit is about to be brought, he urges, "Wait until I can see Leathers. Leathers ought to be responsible for this." According to the view which I take of the testimony, Captain Stein evidently had that idea, that these patentees, who had more interest in the thing than anybody else, who had everything at stake in its success, who selected the most prudent captain upon the entire river to introduce this wonderful invention of theirs, by placing it upon his new boat which he was then constructing, were responsible for its success. What duty does the law impose upon each? It will not be denied that when a mechanic undertakes to perform any work, or to furnish any materials, he is required to do it in a skillful and workmanlike manner; that the materials must be proper and suitable for the purpose. If he undertake to make an article for a specific purpose, it must be reasonably fit and suited for that purpose. Was the

mechanical labor performed in a skillful and workmanlike manner?

Testimony clearly shows that the workmanship was good, and that the materials furnished were up to the standard. He is a machinist of good reputation, and was on that very account selected by the patentees. Ross, McFarland and Goode, the engineer of the boat, all testify to the good character of the work. It is true, Jones and Stein both claim that the workmanship was inferior; but then Stein is no machinist, and Jones in a previous letter made no specific objections to the machinery. The law, however, requires, that he who undertakes to make a particular article, for a specific purpose, shall make that particular article fit for the uses and purposes for which it was constructed; but it is also a well known proposition in law that the machinist may by a specific contract release himself from this responsibility. This Moore claims he had done, by refusing to guarantee it. It appears that the machine was simply an experiment. Out of the hundreds of boats navigating the Western waters only three have adopted it. No wonder that Moore, who had never manufactured the machine, refused to take the responsibility. The patentees claimed that the machine was so valuable that there "was millions in it." The machine was an utter failure; it failed to answer the purpose required of it. But as Moore made it at Captain Stein's instance, and as Moore refused to guarantee it, the law imposes the duty of paying for it upon Captain Stein. The patentees are the only men who guaranteed it. They said that Stein should not lose anything if it was a failure; that if it did not perform its office, Stein should pay nothing for it. And how, in the face of all these letters of theirs, they can say that they have nothing to do with it, is very strange to me. Now what is the law upon this state of facts? Broom, Leg. Max. 776, 777, states: "Accordingly, where an agreement is for a specific chattel, in its then state, there is no implied warranty of its fitness or merchantable quality; but if a person is employed to make a specific chattel, there the law implies a contract on his part that it shall be fit for the purpose for which it is ordinarily used." Such, I said, would be the law in this case, if the party who made it was not protected by a specific contract which he made, that he would assume no such responsibility. But this doctrine is laid down by Broom, and is recognized in Benj. Sales, 479; Chit. Cont. 391; and Strong, Sales, 371, as modified in Broom, Leg. Max. 661, where he says: "A marked distinction will at once be noticed between the cases falling within the class just noticed" (which is the class I have alluded to) "and those in which it has been held that, where a warranty or contract of sale has reference to a certain specific chattel the purchaser will be liable for the price agreed upon, on proof that the particular chattel specified has been duly sent according

to the order, and will not be permitted to engraft any additional terms upon the contract. If, for instance a two-color printing machine, being a known and ascertained article, has been ordered by the defendant, he cannot excuse himself from liability to pay for it by saying that the article in question does not answer his purpose, because the sole undertaking, in this case, on the part of the vendor, was to supply the particular article ordered, and that undertaking has been performed by him. If, on the other hand, the article ordered by the defendant were not a known and ascertained article, as if he had merely ordered, and plaintiff had agreed to supply, a machine for printing two colors, the defendant would not be liable, unless the instrument were reasonably fit for the purpose for which it was ordered. In Benjamin on Sales (section 56) he says: "A mistake by the buyer in supposing that the article bought by him will answer a certain purpose for which it turns out to be unavailable, is not a mistake as to the subject-matter of the contract, but is a collateral fact, and affords no ground for pretending that he did not assent to the bargain, whatever may be his right afterward to rescind it if the vendor warranted its adaptability to the intended purpose." And in Story on Sales (section 372): "Thus, where the plaintiff was the patentee and manufacturer of a patent machine for printing two colors, and the defendant, having seen one of the machines on the plaintiff's premises, ordered one, the plaintiff in a written memorandum undertaking to make 'a two-color printing machine on my patent principle' —and in an action for the price, defendant excuses himself from liability on the ground that the machine had been found useless for printing in two colors. It was held that if the machine described was a known and ascertained article, ordered by the defendant, he was liable whether it answered the purpose or not; but that if it were not a known and ascertained article, and the plaintiff merely agreed to supply a machine for printing in two colors, the defendant was not liable unless the instrument was reasonably fit for such a purpose." This doctrine is very clearly laid down in Ollivant v. Bayley, 5 Q. B. 288; Chanter v. Hopkins, 4 Mees. & W. 399; Prideaux v. Bunnett, 1 C. B. (N. S.) 613, where the authorities are cited on this question.

Here, in this case, a known patentable article is purchased, and the machinist undertakes to supply it in accordance with the plans furnished to him. If it operates, all well and good. The law requires him to construct it according to the well-recognized plan. If he fail to do this, and the machine does not operate on that account, he loses his money. It appears that at the request of the patentees and Captain Stein, he, Moore, goes to New Orleans and Memphis to inspect the working of a similar machine on board the Natchez. The patentees furnish the plans, and one of them testifies that these plans were correct drawings of the condenser upon the Natchez. Moore says, that the machine he built was in exact accordance with the plans furnished to him except as to the position of the condenser. There is no proof that this change caused the failure of the machine. If he undertook to make any changes, and these changes were the cause of the failure, he would have to stand the loss. In such a case Captain Stein could rely upon the judgment of the mechanic, and if the proof showed that the attempted improvement led to the failure, the mechanic was responsible. But there is no proof that the breaking of the valves, or failure of this machine, was owing to any change made by Moore in the plans.

There is, however, one significant fact in the case, which has an important bearing on the conclusion to which we have come. There is a letter of Jones, one of the patentees, written after the failure of the steam condenser, in which he says: "It is true that the drawings were handed to you (Moore) by Pauley, and I presume that he mentioned to you that the valves must be balanced, and that the drawings in this respect must be modified." And then goes on to say that they intend making improvements in the plans until they are perfect. Here is an admission that these plans furnished to Moore are incorrect, and now when the machine fails, they attempt to shield themselves upon the pretense that it was not properly constructed. What were the defects of the plans, or the cause of the failure of the machine, does not appear. Moore and Goode, the engineer of the boat, are positive that the result was produced by a too great pressure of steam. The great fact, however, remains, that Moore made the machine according to the plans furnished by the patentees, and that these plans were wrong. In the construction of a defined machine he has fully complied with what the law requires. It is hard upon Capt. Stein. Had the patentees been before the court, Capt. Stein could have called upon them to fulfill their guarantee. As it is, a decree must be rendered for the libellant for the balance due upon his account, $2,333.